Please be seated. Good morning. Before we begin the argument calendar, there are three cases submitted on the briefs at this time. Those are United States v. Schmidt, United States v. De La Rosa, and Perez-Gonzalez v. Barr. So we'll begin the argued calendar with United States v. Renteria. Good morning. May it please the I'm sorry, counsel. I'm having difficulty hearing you. Can you hear me now? Oh, perfect. My name is Celia Ruman and I represent George Renteria. I'm going to try to reserve two minutes for rebuttal. This is not a case where there was overwhelming evidence that Mr. Renteria was guilty of first-degree premeditated murder. And for all the reasons stated in his briefs, he asked this court to reverse his convictions and remand this case. However, given the time constraints that I have here, I'd like to focus on two issues, unless the court has questions about the other issues. The issues that I'd like to focus on are the sufficiency of the evidence and the expert witness issue. Regarding the sufficiency of the evidence issue... You're talking about evidence of premeditation. That's correct. On the issue of premeditation, on that required and essential element. In its responsive brief, the government in this case has urged this court to apply the miscarriage of justice standard. But that's not correct in this case, because in this case, trial counsel did not specifically identify the basis for his Rule 29 motion. He simply asserted his theory of the defense, that the defendant wasn't the shooter, and made kind of a summary assertion that there was insufficient evidence. This court's ruling in United States v. Navarro says that's enough. A defendant need not state a specific basis. And whereas here, the defendant did not state a specific basis for the Rule 29. The miscarriage of justice standard is inappropriate. Well, regardless of the standard, why isn't the evidence about the things that your client said to his cousin, you know, I'm going to get him. And then the victim saying, you know, to his sister, well, I hope I come back. Why isn't that sufficient to, among other evidence, to support the verdict, regardless of the standard of review? Well, I think there's a lot of reasons why those facts, as the government has articulated them, are insufficient. Primarily, it turns on the test that this court identified in Neville's that was consistent with Jackson. As this court's aware, there's two parts to the test. The first part of the test is that the evidence and reasonable inferences are considered the light most favorable to the government. And in focusing on that, it's important to remember that a reasonable inference is one that's supported by a chain of logic. Being consistent is not enough. But that isn't the only part of the test. There are two parts to the test. The second part of the test requires that this court determine whether the evidence taken as a whole, including evidence of innocence, and the Neville's court specifically said that, could allow any rational trier of fact to conclude the essential elements beyond a reasonable doubt, which is... So, applying that test, we have your client telling someone before the incident that he was going to blank the victim up. We have your client, after the fact, acting in a fairly rational manner, apparently hiding evidence of the crime. And we have the victim on his way to being murdered, in a car with your client, telling his sister that he's worried about whether he will come back. Aren't those facts from which a rational trier of fact could conclude that this was a premeditated crime? I think as to the testimony of Ms. Percy about what Mr. Renteria said to her, I actually think that statement, along with what else he said during that conversation, the only reasonable inference of that is that, at that point, there was not even an intent to kill. What he said is, I'm going to get him. And he identified the person he was speaking to as Jessica. Well, if his intent was to kill Mr. Morioki at that point, there was no reason to lie about the identity of the person he was speaking to. Because dead men can't come back and be a witness. Those two things, the only reasonable inference that can be drawn from... No, it's not the only reason. You're drawing, I think, an inference that might be reasonable from that conversation. But it's not the only reasonable inference from that conversation, is it? I think that it is, because the other option is he's acting irrationally, and there's no evidence of that in the record. In lying about a person he obviously knows their name of, it doesn't make sense. If you intend to kill somebody... But the after actions clearly were those of a rational, deliberative person who is trying to clean up the car, find all the shell casings, so on and so forth. And, you know, that's what makes the other inference of the earlier conversation much more plausible, at least to a jury. And can't the jury take into account that he took Max to a deserted field in a stolen car and brought a loaded gun with him? Isn't that all part of the picture? What else could he have planned to do if that were the case? Well, I think we can speculate about the meaning of all these things, but when you look at whether there's a chain of logic that indicates that's evidence of premeditation, obviously this court in the Begay case allows the consideration of post-conduct evidence in determining whether there's sufficient evidence of premeditation. But I would urge this court to look at the differences between the evidence that this court found sufficient in the Begay case and the evidence that's present here. In the Begay case, that was a homicide that had witnesses, and the evidence of the post-conduct trying to hide it was the defendant telling someone to shut up. That person had just witnessed the incident. Well, that doesn't respond to Judge O'Scanlan's question about the nature of the transportation and taking the weapon with him and so forth. I don't think there's any evidence in the record that this vehicle was stolen to hide a later offense. There's no doubt this vehicle was stolen. And that was the vehicle he happened to be driving that day. Right, but he also had the loaded gun with him, right? Well, he had. Well, I don't think that's true. I mean, obviously the gun was at the scene. Well, it must be true. He didn't come out of thin air when he killed him. You're right. I misspoke. What I meant to say was there's no evidence that he brought the weapon to the scene. What we know from the record is that when Mr. Morioki and Mr. Renteria were last seen, there was another party with him. And we know that when Mr. Renteria was later seen cleaning the car, it was with another person. So a reasonable inference from that is that the other person was there. To speculate as to who of those two people brought the firearm to the scene. Except your client had earlier, I believe the same day, had broken into someone's apartment with a handgun, right? He was seen earlier in the day with what was described as a handgun. And the witness said she believed it was a BB gun and she was familiar with BB guns. That's obviously not the weapon that was used in the killing in this case, which was a .40 caliber, which has a much larger... But it makes it more likely that he was the one with the weapon, doesn't it? Well, I think even if these things are to be considered as reasonable inferences, giving the government every benefit of the doubt. The question that becomes whether any rational juror putting them together, given how weak each of them was, given the actual state of the evidence, could have reasonably concluded that there was proof beyond a reasonable doubt. Counsel, couldn't the jury take into account the evidence that he confessed to DP that he shot Max multiple times and picked up all the casings? Doesn't that go to the issue? It goes to the issue very clearly of whether he killed him. And we're not disputing that there's evidence that he killed him. The question is, is it evidence of premeditation, which is evidence of a cool mind and not only capable of reflection, but evidence of actual reflection. And while evidence of post-offense conduct can be considered, it's an after-the-fact assessment of what was in the defendant's mind before the offense occurred, which is when it was there. And it needs to be evidence of a cool mind that's actually reflecting. And I think that, you know, in this case, the evidence is that this is someone, I think the evidence shows that he's not acting coolly all day. As Your Honor pointed out, this is someone who earlier in the day was rationally accusing people of assaulting his girlfriend's mother, who was pushing his way into the apartments of people he knew and who cared for him as family members. This is someone who the actual evidence in the record demonstrates a lack of cool mind and cool reflection. It actually, the evidence that's available on that goes the other way. Unless the Court has additional questions, I'd like to spend just a few minutes on the question of the expert witness. Because in this case, I think especially given the weight of the evidence, this is important. As the Neville's Court says, the Court has to the Officer Figueroa testified about a lot of different things. Tell us what your best argument is. What's the thing that you think most violates the expert witness rule? Well, I think it's hard to say which of them. I think you've got to pick one. I asked you to pick one. I know. I know. I'm trying to think about it, Your Honor. I think that the one that is the best is the ballistics, quite frankly, because I think there's no doubt in the record that there's an objection to the ballistics testimony. So, run through that for me because I was having, I was trying to figure out what part of that goes over the line in your view. Well, what goes over the line and what we've argued is that it violated Rule 16 because the government gave no notice that these experts would, that he would testify as an expert. And the ballistics, I think, is the strongest because... Tell me why it's expert testimony. Well, I think it's expert testimony. I think the District Court even recognized it as expert testimony because there was an objection to the testimony that was sustained on foundation. The government laid additional evident, elicited additional testimony about his expertise. There was a renewed objection and it was sustained. Tell me what he said that was an expert opinion. Well, what he testified to, first of all, was the range at which the offense occurred. So he testified that this was a close range shooting. And he testified about his expertise about how a .40 caliber weapon discharges bullets and therefore the meaning of the footprint evidence that he identified at the scene. So he is putting the defendant very close to the... But there was a forensic expert about the footprints, was there not? There was a forensic expert about the footprints. And all that the officer said was, I see two sets of footprints going in and one set of footprints going out. I'm not sure, I'm not sure I need to be much of an expert to know that two people came and one person left. Well, I think that that's overstates what the actual experts testified to. For example, the medical examiner in this case testified that the shooting was at least two to three feet away and as far away as ten to twenty feet. That contradicts what Officer Figueroa said in his testimony. Well, it depends on what you mean by close. Well, I think... I could say that you and I are standing for, you know, fairly close together. But what he testified about the foot track evidence is that some of it overlaid each other, putting the footprints right next to where, as he said, Mr. Morioky was shot and fell. But that's a physical observation. That's not expert testimony. He said, I looked at the footprints and some of them overlaid each other and then there's another set of footprints that's a single set that happens to your clients going out. So my conclusion from that, I don't think you need to be Inspector Clouseau to figure this out, is that two people came in and one person left. So I'm not sure that I see that as relying on particular scientific knowledge. You're closer on how far away the bullets were fired, but the medical examiner said it was at relative close range. So I'm having a difficult time figuring out why any of this is prejudicial expert testimony. Well, I think in this case that it's prejudicial because, as the government presented this case, this was a cold killing in close range, essentially... Is it less cold if it's at 20 feet? Well, I think the evidence of, you know, drawing any inference that he intended the fatal result is different because the potential harm is the likelihood of doing irreparable harm is, I think, greater. When you shoot somebody seven times, it's pretty hard to say that you're not intending fatal harm. Well, and obviously we didn't challenge that element under the sufficiency of evidence, but in thinking about the expert testimony that this officer gave, I think it is a relevant consideration. I would like to reserve the remainder of my time... You may do that. ...unless the court has additional questions. Thank you. May it please the court. Good morning, Your Honors. My name is William Voigt. I'm an AUSA from here in Phoenix on behalf of the United States. And with the court's permission, I'll turn right to premeditation and then, like my colleague, go to Sergeant Figueroa's testimony. Just as there was overwhelming evidence that the defendant was the one who murdered Max, including his confession, there was more than enough evidence to support the defendant's claim. And I will, with the court's permission, use the profanity because it is the evidence in this case. He said he was going to fuck Max up and he was going to get him. That's in ER 467, and this is in the hours before Max was killed. Any reasonable jury listening to that testimony, and frankly, just based on that testimony alone, is going to support the defendant's claim. And I will, with the court's permission, use the profanity because it is the evidence in this case. He said he was going to fuck Max up and he was going to get him. That's in ER 467, and this is in the hours before Max was killed. Any reasonable jury listening to that testimony, and frankly, just based on that testimony alone, is going to support the defendant's claim. That's fair, Your Honor. The testimony was that as they were walking up to D.P., D.P. said he was referring to Max and that, in fact, she knew what he meant was Max wasn't safe. Certainly, a jury could reasonably infer from the absence of any evidence that anyone else was there, he was talking about Max. Counsel, your opposing counsel refers to the Begay case. Do you have a response? I do, Your Honor. I think that this is much more premeditation than in the Begay case. In the Begay case, the premeditation was the defendant walking across the street getting a gun from a car and coming back. Here we have a defendant bringing a gun miles and miles and miles into the abandoned reaches of the Gila River Indian Reservation, using a stolen car, having told the victim lies to get him to get into that car, after having announced an intention to F him up and to get him. So I think that there's much more time for the defendant to have premeditated this killing than... I know you're not required to show it, but it's often helpful for premeditation to focus on motive. I had a hard time reading the record in this case, discerning what the motive might have been. Was there any evidence of motive? There was, Your Honor. I will freely concede it's not the strongest argument that the government has, and this Court has repeatedly said you don't have to show motive because it is difficult to do so. It's hard to crawl inside someone's head. But the evidence was as follows, and I think that a rational person can construct basically what happened here. The defendant is animated by one thing that day. He is angry that somebody has beaten up, he thinks, and hospitalized his girlfriend's mother. So angry that he's kicking his way into apartment rooms, that he's putting a gun to the head of Katie, a 90-pound little old lady, stealing her cell phone, accusing people of being responsible for this. A few hours later, he is seen in the same place with Max, getting Max into that car where he drove him down to the reservation. And we know that Max at that point was afraid, very afraid for his life, because he told his sister, find me if I disappear, which is what you say when you know you're in mortal danger. Does the anger evidence cloud the issue of premeditation? Would it affect that issue? I don't think so, Your Honor, because as my friend pointed out in her brief, the interactions with Max are cold and calculated. Nobody sees them arguing. Nobody sees him threatening Max. When he's around Max, he's calm and he's operating with a cool mind. And so that fact supports premeditation. It doesn't cut against it. And then he's lastly caught on a jail call describing having talked to DP about the day that his aunt was put into the hospital, having talked about a dude who was telling lies to him. And he says, I effed up. And the only person DP talked to that day that the defendant talked to with DP about Max that day was Max. And as a consequence, I think a reasonable jury could conclude he thought Max had something to do with this, and he drove him down to the reservation and killed him as a result. But that is certainly one category of evidence in accompaniment with the declared intent to attack the victim, the victim's last words, the location of the murder being an isolated dirt field, the manner of the killing, which we haven't talked about a lot, but seven bullet wounds clustered on the right side of the victim's body, transecting vital organs. I think that to the extent that the defense wants to argue that things were farther away, that would only increase premeditation, because to get this tight cluster of wounds, you'd have to be aiming even more carefully in addition to the calculated behavior before the murder, the lies to Max, the preparatory activities, and after the murder, picking up shell casings, spending hours being caught on video, spending hours cleaning out the car and wiping down the car. This is evidence of someone who operated with a cool mind and a steady hand and a cold heart, and that's premeditation. Unless there are further questions on that, I'll turn to the argument about Sergeant Figueroa. The government does believe that this is clearly a plain error standard because the objections that were made below were not Rule 16 objections. My friend, I'll start with the— Well, let's assume for our purposes that it was objected to. The other side would still have to show, because this is not constitutional error, some prejudice from it. It would be helpful for me to sort of walk through what things that Sergeant Figueroa said that, in your view, qualify as lay expert testimony under 701, and what things are just the observations of a precipient witness. Absolutely, Your Honor. And just to expound very briefly on the first part of Your Honor's question, the hurdles he has to jump are, first, to show that something is an opinion as opposed to a description of facts. Right. Second, that it's expert versus lay. Third, that Sergeant Figueroa is unqualified to give that, even if it's expert. And fourth, that it would have changed the jury's verdict for him to receive a notice. Right. And I understand your point is that this is all lay testimony. We never need to get much farther because it's all lay testimony. And some of it, I'm not sure it's prejudicial, but some of it seems to me to be pretty close to the line. And let me respond specifically on the ballistics, which is what my friend identified here. And I believe she identified two things, the quote-unquote close-range testimony and then the ejection of semi-automatic rounds to the right. With respect to the testimony about close range, I can read it to the court. It appears on ER 426-27. He had been describing the fact that he saw where he saw the tire treads, where he saw the footprints, a perfect fact description of what actually they're looking at on the screen in the photograph. And he says, quote, it occurred to me that if this interaction was what caused his death, it appeared to me to be something that had happened at close range. If that is an opinion, and I don't know how much, you know, inference you have to make to reach that. And you did have the medical examiner testifying that these bullet wounds were inflicted from a distance somewhere up to 20 feet. Absolutely, Your Honor. And there is no evidence of anything other than in this close area of any activity there. There's Max's body right around at footprints and tire marks. There is some testimony about the way that spent cartridges would be ejected from this type of weapon and where they would go. Can you address that? Yes, Your Honor. And just to briefly preserve the point, the objection here is not Rule 16. This was the exchange. The question was, do you have any idea or any understanding where those shell casings would go? Objection, Your Honor. That calls for speculation. So it's not an expert objection. But even assuming that it was, his testimony was that, quote, this is ER-426, based on my experience, both personally and professionally, I've never shot a semi-automatic firearm that had an ejection pattern that was other than to the right. That is a classic Von Wille-style lay opinion about something that does not require scientific. In the end, does that opinion make any difference? I don't think it makes a difference. Because he does testify. I then searched the scene to find. He doesn't say just to the right. Or if he did say just to the right, he would be subject to impeachment. Why didn't you search to the left? He did testify. He searched the whole scene. There was testimony. There were no casings anywhere. The reason it was put in is because the jury is looking at sort of the dog that didn't bark slide, this area next to the right of the body, and there's no shell casings there. But his testimony, he searches all around. He does. And under the body for the shell casings. Correct. So even if he's ‑‑ whether or not this ejects to the right doesn't seem to me to bear on any issue in this case. Well, I think that it's ‑‑ Or any issue of guilt. Because the important point is that he couldn't find any shell casings. I think that's right, Your Honor. I think that it was introduced to explain the particular photograph and why he spent time looking there. Because, you know, when you eject from a semiautomatic round, if it goes to the left, it's going to smack you in the face. As this Court said in Graber and the Gadson case, excuse me, a lay witness's opinion testimony necessarily draws on the witness's understanding, including experience, education. Those are things that's perfectly reasonable for somebody to be able to put before the jury in lay testimony. What about his testimony about the angle at which the crime probably occurred? He talks about how ‑‑ I think he does testify how he thinks the gun was pointed. I mean, I think that that's just a lay description of what he's looking at at the scene. He's looking at where the footprints are. He's looking at where the tire marks are in relation to that. But I don't think that, again, even if there's some scientific or technical knowledge that would be required to offer that testimony, which was unobjected to, I don't see how it could change anything. The medical examiner testified exactly about the angles that the bullets went into the body, about where the bullet wounds were. So I don't think there's anything in there that requires specialized technical scientific knowledge in order to offer an opinion. Now, I took you off at the beginning your waiver objection. Could you identify which portions of the testimony there was any objection to? Yes, Your Honor. There were two objections in the record. One was the one we talked about, which was on ER 424, which was that calls for speculation when he was asked about where bullets are ejected from firearms. And the second is an objection on ER 357 to 58, and that was an objection to relevance. It was not a Rule 16 objection. The question was, once a location is found and a body is located, do more law enforcement respond? And the witness starts to talk about, yeah, if somebody's injured, we'll call the medics, and if there's somebody who's dead, we're going to call more police officers. And the defense lawyer objects and says, I object to this line of questioning. It isn't really responsive or relevant. So that's a relevance or nonresponsive objection, not a Rule 16 objection. But, again, how does he jump all of the hurdles in this case? Even assuming that his response is somehow getting into the realm of an opinion, is it expert testimony to say that if you find a body, more police officers are going to show up? Even if it is, how is Sergeant Figueroa unqualified to offer that as an opinion? And even if he were unqualified, how could you describe that as prejudicial? Of course they showed up, and he testified factually that more law enforcement officers did. Those are the only objections that are raised. None was a Rule 16 objection. So it is plain error. Unless there are other questions from the Court on any of the matters that are before it, then the United States would respectfully ask that you affirm the judgment in all respects. Thank you. Just a few points I'd like to make. On the sufficiency of evidence, the government asserts that he drove to an isolated scene. The evidence is he drove from Chandler. He was in Chandler, and he was headed towards Maricopa. Between those two spots is the reservation. The fact that that's the nature of the area doesn't indicate that it was by design. And to make that inference when it is a rural area I think is weak at best. As to the find me if I disappear, the government asserts, seemingly to give gravitas to that, that those were his last words. Well, we don't know those were his last words. In fact, what we know is that at some point in the day he called his cousin Prima Mendoza after he was seen. So we know that there's a conversation that occurs or a phone call that occurs by the decedent to his cousin Prima Mendoza, and that's at ER V2 at page 200. This is the kind of speculation that doesn't support reasonable inferences. To assert these are his last words is pure speculation, especially when the record suggests there's a question about whether that's the case. Even if this Court finds that some of these things are reasonable inferences, which we obviously assert that they weren't, taken together, they are insufficient under the standard which requires that any reasonable juror find proof beyond a reasonable doubt. The Jackson case rejected the sum evidence standard or a modicum of evidence, and we urge this Court to reverse Mr. Renteria's convictions on that basis. Thank you, counsel. Thank you. The case just argued is submitted, and we very much appreciate helpful arguments from both of you.
judges: O'scannlain, Graber, Hurwitz